IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| APRIL M. BOWMAN, ) | Civil Action No. 3:12-3589-DCN-JRM |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| CAROLYN W. COLVIN, ACTING ) | |
| COMMISSIONER OF SOCIAL SECURITY,[1] ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This case is before the Court pursuant to Local Civil Rules 73.02(B)(2)(a) and 83.VII.02, et seq., DSC, concerning the disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB").

**ADMINISTRATIVE PROCEEDINGS**

Plaintiff initially filed for DIB on August 5, 2009, alleging disability as of August 14, 2004.[2] Tr. 164. Plaintiff's application was denied initially and on reconsideration, and she requested a hearing before an administrative law judge ("ALJ"). After a hearing (Tr. 53-76) held on February 3, 2011, at which Plaintiff appeared and testified, the ALJ issued a decision (Tr. 36-45) dated February 25, 2011, denying benefits. The ALJ found that Plaintiff was not disabled because under the medical-vocational guidelines (also known as the "Grids") promulgated by the Commissioner, Plaintiff

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Commissioner Michael J. Astrue as Defendant in this action.

[2]Plaintiff subsequently amended her alleged onset date to November 1, 2004. Tr. 54.

remains able to perform work found in the national economy. See 20 C.F.R., Pt. 404, Subpt. P, App. 2.

Plaintiff was thirty-three years old at the time of the alleged onset of her disability and thirty-eight years old at the time she was last insured for DIB. She completed one year of education beyond high school. See Tr. 173. Plaintiff has past work experience as a restaurant server. See Tr. 44, 55, 169. Plaintiff alleges disability due to a back and hip injury. Tr. 168.

The ALJ specifically found (Tr. 38-45):

1.  Claimant last met the insured status requirements of the Social Security Act on December 31, 2009.

2.  Claimant did not engage in substantial gainful activity during the period from her amended alleged onset date of November 1, 2004 through her date last insured of December 31, 2009 (20 CFR 404.1571 *et seq*.).

3.  Through the date last insured, claimant had the following severe impairments: degenerative disc disease (20 CFR 404.1520(c)).

4.  Through the date last insured, claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, I find that, through the date last insured, claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with some additional limitations. Specifically, claimant can lift and carry up to 20 pounds occasionally and 10 pounds frequently.  She can stand, walk, and sit for 6 hours each in an 8-hour day. Claimant, however, can only occasionally stoop and can only occasionally climb ramps and stairs.  She can never climb ladders. Pain would limit claimant to performing simple, routine, repetitive tasks consistent with unskilled work.

6.  Through the date last insured, claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  Claimant [] was 38 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. Claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that claimant is "not disabled," whether or not claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that claimant could have preformed (20 CFR 404.1569 and 404.1569(a)).

11. Claimant was not under a disability, as defined in the Social Security Act, at any time from November 1, 2004, the amended alleged onset date, through December 31, 2009, the date last insured (20 CFR 404.1520(g)).

On October 26, 2012, the Appeals Council denied Plaintiff's request for review (Tr. 1-5), thereby making the determination of the ALJ the final decision of the Commissioner. Plaintiff filed this action in United States District Court on December 20, 2012.

## **STANDARD OF REVIEW**

The only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389 (1971); Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1972). Under 42 U.S.C. §§ 423(d)(1)(A) and 423(d)(5) pursuant to the Regulations formulated by the Commissioner, Plaintiff has the burden of proving disability, which is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a).

## MEDICAL EVIDENCE

On August 16, 2004, Plaintiff was treated at Doctor's Care for complaints of hip pain after a fall. Medication was prescribed. Tr. 203-204. Plaintiff returned to Doctor's Care on August 22, 2004, and physical therapy was prescribed. Tr. 202. After two weeks of physical therapy, Plaintiff returned to Doctor's Care on September 15, 2004. It was noted that her gait was normal, but she was still experiencing right hip pain. Tr. 205. On September 27, 2004, an MRI revealed mild degenerative disc disease at L2-3 and L3-4, with no disc herniation or spinal stenosis. Tr. 208. On October 1, 2004, it was noted that Plaintiff was unable to continue with physical therapy due to "excruciating" pain. Tr. 207. Doctor's Care released Plaintiff to return to work on November 9, 2004, with restrictions of no lifting more than ten pounds; no repeated bending, stooping, squatting, pushing, jerking, twisting or bouncing; no continuous standing and/or sitting; minimum walking and climbing; and no overhead lifting. Tr. 217.

Dr. Charles H. Hughes, Jr., of Orthopaedic Specialists of Charleston, evaluated Plaintiff's complaints of low back and hip pain on November 29, 2004. Dr. Hughes' impression was right hip and low back pain, possibly sciatic in origin. He noted that x-rays of her hip were "unremarkable." Dr. Hughes recommended that Plaintiff have an epidural block, and continue light duty, sedentary work. Tr. 210-211. After two epidural blocks, Plaintiff returned on December 20, 2004, and Dr. Hughes noted that Plaintiff was 50% better. Straight leg raising was negative, and her hips had normal range of motion. He recommended continued physical therapy and that Plaintiff continue with sedentary work. Tr. 212. Plaintiff returned to see Dr. Hughes on January 27, 2005. Dr. Hughes prescribed Bextra for inflammation and noted that her long-term prognosis was guarded. He

recommended a functional capacity evaluation ("FCE"). Tr. 213. On March 9, 2005, Dr. Hughes noted a FCE indicated Plaintiff was capable of sedentary activity. Tr. 214.

In June 2005, Dr. Hughes noted Plaintiff had full range of motion in her hips, good reflexes, and some mild degenerative disc disease. He rated her as 5% whole person impaired. He released her back to work with permanent light duty restrictions. Tr. 216.

Plaintiff was seen by Dr. Steven Poletti of Southeastern Spine Institute ("SESI") on September 13, 2005. Based on his examination and an MRI, Plaintiff was found to have degenerative disc disease at L2-3 and L3-4 as well as possible right spondylosis at L5. Plaintiff was also diagnosed with a disc disruption at L5-S1. Tr. 244. On November 9, 2005, Dr. Poletti opined that Plaintiff could be a potential candidate for surgery. Tr. 258. Plaintiff returned to Dr. Poletti on December 14, 2005, after having a CT scan. At that time Dr. Poletti advised Plaintiff against surgery and told her to live with the pain. He noted he did not think she had true spinal instability, but might have a degenerative disc contributing to her pain. Tr. 257. Dr. Poletti performed a diagnostic lumbar discogram on February 2, 2006. It was noted that Plaintiff had painless disc disruption at L3-4 with probable normal disc at L4-5, L5-S1 with no pain reproduction. Tr. 240.

A June 2, 2007 discogram revealed some abnormality at the L5-S1 vertebrae, and Dr. Poletti recommended surgery. The L3-4 and L4-5 discs were reported to be normal. Tr. 231-232, 254.

Plaintiff was seen at Palmetto Interventional Pain Management ("PIPM"), a division of SESI, on July 6, 2007. She reported continued pain in her low back and right leg as well as bilateral foot numbness. The impression was that she had a lumbar disc disorder and an annular tear at L5-S1. Plaintiff was continued on her prescribed medications (Lexapro, Robaxin, Lortab, Oxycodone, and

5

Valium) and a Medrol Dosepak was added. Tr. 274. Plaintiff returned for pain medication follow-ups through February of 2012. See Tr. 274-288, 327-328, 330-331, 353-354, 403, 407, 420.

Plaintiff underwent an MRI on October 30, 2007, which showed mild spondylosis with no significant stenosis or neural impingement. Tr. 259. On November 1, 2007, Plaintiff underwent a discectomy and interbody fusion procedure, with no complications. Tr. 224-230. On December 17, 2007, Dr. Poletti noted some short-term improvement. Tr. 252. Plaintiff continued follow-up appointments with SESI. See Tr. 329, 332, 336, 344-347.

Plaintiff received Depo-Medrol injections on December 19, 2008 for her diagnosis of lumbar spondylosis. Tr. 275. Plaintiff was monitored for the next few months and on May 19, 2009 a branch block on the right was recommended. Tr. 276-281. On May 29, 2009, Plaintiff underwent a medial branch block at S1-3, bilaterally. Tr. 282. Plaintiff returned on follow-up on June 16, 2009, and it was noted she ambulated with an antalgic gait, had normal muscle tone, had negative straight leg raising bilaterally, and had 5/5 strength of her lower extremities. Tr. 283. On June 26, 2009, Dr. Mark Netherton of PIPM stated in a letter that Plaintiff was not a good candidate for surgery. He wrote that he felt that Plaintiff was going to be a candidate for some type of vocational rehabilitation in the future (after undergoing rhizotomy) and she had some degree of physical impairment. Tr. 284 - 285. On October 21, 2009, an MRI indicated mild lumbar spondylosis, and showed no evidence of residual or recurrent protrusion at L5-S1. Tr. 325-326.

On December 12, 2009, Dr. Temisan L. Etikerentse performed a consultative examination. He noted that Plaintiff was status post laminectomy with postlaminectomy syndrome, and continued to complain of pain despite having multiple injections. Dr. Etikerentse also noted that Plaintiff had

attended physical therapy. Dr. Etikerentse opined that Plaintiff could not perform her past work as a waitress and she would have problems with bending, lifting, and stooping. Tr. 290-295.

On December 18, 2009, state agency psychologist Dr. Michael Neboschick reviewed Plaintiff's records and opined that she had no severe mental impairment. Tr. 296. Dr. Lisa Varner, a state agency psychologist, affirmed Dr. Neboschick's opinion on May 27, 2010. Tr. 350.

On December 22, 2009, state agency physician Dr. William Cain reviewed Plaintiff's medical records and opined that Plaintiff could lift and/or carry up to twenty pounds occasionally and up to ten pounds frequently; could stand and/or walk and could sit for about six hours in an eight-hour workday; could occasionally climb ramps and stairs; and could never climb ladder, ropes, or scaffolds. Tr. 310-317. Dr. Jean Smolka affirmed Dr. Cain's opinion in May 2010. Tr. 350.

An x-ray on February 25, 2010 (approximately two months after Plaintiff's last date insured), showed solid arthrodesis at L5-S1 with well maintained disc height spaces at the levels above L5-S1. Tr. 344. In May 2010, EMG and nerve conduction studies showed no evidence of radiculopathy affecting either of Plaintiff's lower extremities. Tr. 345.

In October 2010, Dr. Netherton completed a Lumbar Spine Residual Functional Capacity Questionnaire. He noted that he first treated Plaintiff in April 2006, she reported an average pain level of six to eight out of ten, she had a reduced range of motion in her back, she had chronic depression for which Lexapro was prescribed, and she had drowsiness from her narcotic medication. Dr. Netherton opined that Plaintiff could sit/stand/walk for a period of less than two hours in an eight-hour day; she could not work in a competitive situation for more than an hour without significant problems; she could walk only a half-block; she could sit for only one hour at a time; she could stand for only thirty minutes at a time; she could lift no more than ten pounds; she could not

bend or stoop; she would miss more than four days of work per month; she would need a job that permitted shifting positions at will; and her pain and other symptoms would be severe enough to interfere with attention and concentration needed to perform even simple tasks constantly. He stated that the earliest date that Plaintiff's symptoms and limitations applied was September 2007. Tr. 379-384.

Notes from Palmetto Comprehensive Center for Pain of SESI indicated that, on July 21, 2010, Plaintiff continued to complain of pain in her low back and hips which was worse with any type of activity. Plaintiff had an antalgic gait, 5/5 musculoskeletal strength in both lower extremities, and negative straight leg raise bilaterally. Tr. 355. A clinic report dated January 31, 2011 noted Plaintiff continued to have the same diagnoses of pain as well as balance problems, that her pain increased with activity, and her pain was better when lying down after taking medication. Tr. 403.

After the ALJ's decision, Plaintiff submitted additional records to the Appeals Council. These records indicate that she was treated at SESI and/or the Palmetto Comprehensive Center for Pain of the SESI in March, July, September, and November 2011, and in February, May, and July 2012. She continued to complain of pain ranging from five to eight out of ten, and medications (including Opana ER, Lexapro, and Flexeril) were prescribed. Tr. 410-433. On September 14, 2011, an MRI of Plaintiff's spine indicated no significant interval change from a prior study of March 2009. The impression was that there was a variant of the normal conjoined tendon sheath on the left at L5-S1 with possible contact of both neural foramen at L4-5 and right neural foramen at L5-S1, but there was no significant stenosis or frank impingement. Tr. 435-436.

**HEARING TESTIMONY**

At the hearing before the ALJ, Plaintiff testified that she could not stand or sit long due to back and hip pain. Tr. 59. She said she had to lie down for two hours total each day. Tr. 60-61. Plaintiff stated she stood and walked for less than two hours each per day. Tr. 67. She stated that before her back surgery she could not walk right, after her surgery she could walk right, but after surgery she still had to "listen" to her back." Tr. 61. Plaintiff acknowledged that her surgery went well. Tr. 71. Regarding daily activities, Plaintiff stated she got up each morning, did what she could around the house until she started hurting, and then sat down awhile. Tr. 62-63. She would lie down from 12:30 to 1:00, then get back up and cook dinner. Tr. 63. Plaintiff stated that with her son's help, she cleans the kitchen after dinner. Tr. 63, 75. She drove when she is not taking her medications. Tr. 68-69. Plaintiff stated she went grocery shopping, and needed help loading her car if she had a lot of bags. Tr. 64. She acknowledged that doctors could not determine any physical pain source, and they recommended no further treatment aside from medication and home exercises. Tr. 72.

**DISCUSSION**

Plaintiff alleges that: (1) the ALJ erred as to his findings regarding her residual functional capacity ("RFC"); (2) the ALJ erred in failing to give proper weight to the opinion of her treating physician; (3) the ALJ erred in relying on the medical-vocational guidelines to find that she was not disabled at step five of the sequential evaluation process;[3] and (4) the Appeals Council erred in not

---

[3]In evaluating whether a claimant is entitled to disability insurance benefits, the ALJ must follow the five-step sequential evaluation of disability set forth in the Social Security regulations. See 20 C.F.R. § 404.1520. The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to her past work, and (5) if not, whether the claimant can make an adjustment to other work. See id.

9

giving reasons or proper weight to new medical reports which were submitted. The Commissioner contends that the final decision is supported by substantial evidence[4] and free of legal error.

A.     Treating Physician

Plaintiff alleges that the ALJ erred in discounting the opinion of her treating physician, Dr. Netherton. She appears to argue that Dr. Netherton's opinion is entitled to controlling weight because he has treated her since 2006, the facet injections he administered provided only minimal relief, and his opinion is supported by reports from Plaintiff's numerous visits to him as well as her visits to his other colleagues at SESI who were in a position to give a medical opinion. The Commissioner contends that the ALJ properly considered Dr. Netherton's opinion and discounted it because his treatment notes did not support his findings and other objective medical evidence was inconsistent with his opined restrictions.

The medical opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. §§ 404.1527 and 416.927; Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial

---

[4]Substantial evidence is:
> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984); Laws v. Celebreeze, 368 F.2d 640, 642 (4th Cir. 1966). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir.1992)).

Under § 404.1527, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors to determine the weight to be afforded the physician's opinion: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527.  Social Security Ruling 96-2p provides that an ALJ must give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p.

The ALJ's decision to discount Dr. Netherton's opinion is supported by substantial evidence and correct under controlling law.  As noted by the ALJ, Dr. Netherton's own treatment notes do not support his limitations. Plaintiff argues that Dr. Netherton's reports support his opinion because Plaintiff reported pain ranging from six to eight out of ten. Such restrictions, however, were based mainly on Plaintiff's subjective self-reports. This does not amount to a showing that the opinion is well-supported by medically acceptable clinical evidence necessary to assign the opinion controlling weight. 20 C.F.R. § 404.1527. "There is nothing objective about a doctor saying, without more, 'I observed my patient telling me she was in pain.'" Craig, 76 F.3d at 590 n. 2; see also Mastro, 270 F.3d at 178.

11

Dr. Netherton cited to MRI evidence, limited range of motion, and a "thump/click" in Plaintiff's hip to support his opinion. Tr. 379, 380. The MRI evidence, however, showed no significant abnormality.[5] The ALJ appears to have accounted for Plaintiff's limited range of motion and hip click by limiting her to light work, and there is no indication that these would support Dr. Netherton's further restrictions.

As found by the ALJ (Tr. 44), other medical evidence also does not support Dr. Netherton's restrictions. A number of diagnostic tests were normal, and many showed only mild to moderate abnormalities. See, e.g., Tr. 255 ("discogram really was not remarkable in terms of reproducing any pain"), 259 (October 2007 MRI indicating mild spondylosis with no significant stenosis or neural impingement), 325-326 (October 2009 MRI indicating mild spondylosis and no evidence of residual or recurrent protrusion at L5-S1), 345-346 (May 2010 EMG and nerve conduction studies showing no evidence of radiculopathy affecting either of Plaintiff's lower extremities). X-rays after surgery showed proper positioning of hardware. Dr. Poletti reported that x-rays revealed that Plaintiff's fusion was progressing well and by August 2008 he stated that x-rays demonstrated solid fusion. See Tr. 247, 249, 321. As noted by the ALJ, pain management records generally documented negative straight leg raise tests; Plaintiff's strength was consistently 5/5 in her lower extremities; and her motor skills, sensation, and cranial nerves were regularly reported to be intact. See Tr. 42. Dr. Etikerentse noted that Plaintiff was able to walk on her toes and heels, tandem walk, and squat without difficulty. Tr. 292. The opinions of Drs. Etikerentse, Cain, and Smolka were consistent with

---

[5]Dr. Netherton cited to an MRI from March 11, 2009. Tr. 379. This MRI is not part of the record. The 2011 MRI compared the study to both the 2007 MRI and a 2009 MRI. It was noted that there was no significant interval change from a March 2009 study. As discussed above, the October 2007 and October 2009 MRIs revealed only mild lumbar spondylosis. Although the 2011 MRI noted several "possible" abnormalities, no significant stenosis or frank impingement were found. Tr. 435.

an ability to perform light work. Additionally, treating physician Dr. Hughes noted many times that Plaintiff could do sedentary or light work and released her to light work in June 2005. Tr. 211, 212, 216.

B.     RFC

Plaintiff alleges the ALJ erred in finding that she retained the RFC to perform unskilled light work.  In particular, Plaintiff argues that the information in Dr. Netherton's Lumbar Spine RFC Questionnaire fails to support such a finding and that Dr. Netherton's findings are corroborated in the other reports from PIPM and SESI. The Commissioner contends that substantial evidence supports the assessed RFC, including the medical opinions, Plaintiff's credibility, the objective diagnostic studies, and Plaintiff's own testimony.

The ALJ's RFC assessment should be based on all the relevant evidence. 20 C.F.R. § 404.1545(a).  Social Security Ruling 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis...." SSR 96-8p. The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule. Id.

The RFC found by the ALJ is supported by substantial evidence and correct under controlling law.  A narrative discussion of Plaintiff's impairments and their impact on Plaintiff's ability to work was included in the ALJ's decision. See Tr. 40-44. The ALJ gave great weight to Dr. Etikerentse's opinion that Plaintiff could not perform her old waitress job and adequately accounted for his opinion that she would have (unspecified) problems with bending, lifting, and stooping by limiting her to

13

light work. The ALJ's determination concerning Plaintiff's physical RFC is also supported by the opinions of the state agency physicians (Drs. Cain and Smolka) who found that Plaintiff had the RFC to perform light work, and the opinions of state psychologists (Drs. Neboschick and Varner) who found that Plaintiff had no severe mental impairments. See 20 C.F.R. §§ 404.1527(e)(2) and 416.927(e)(2); SSR 96-6p ("Findings of fact made by State agency ... [physicians ]... regarding the nature and severity of an individual's impairments must be treated as expert opinion of non-examining sources at the [ALJ] and Appeals Council level of administrative review."). Additionally, an RFC for light work is supported by Dr. Hughes' release of Plaintiff to light work in June 2005. Tr. 216.

The ALJ noted inconsistencies between the objective evidence and Plaintiff's statements in determining that she was less than fully credible. Tr. 41-43. He further found that Plaintiff's reported activities of daily living (which included her preparing dinner, cleaning the kitchen with help, doing laundry, shopping, feeding her cat, taking her dog out in the yard on a leash, periodically going out, driving a couple of times a week, and the ability to drive from Summerville to Mt. Pleasant for doctors' appointments) was inconsistent with a finding of disability.

Plaintiff argues that the ALJ erred in not accounting for Dr. Netherton's opinion in his RFC analysis. As discussed above, the ALJ properly discounted this opinion and thus was not required to include all of Dr. Netherton's restrictions in his RFC determination. The ALJ reasonably took into account Dr. Netherton's opinion that pain interferes with Plaintiff's attention and concentration by finding that this symptom would limit her to performing simple, routine, repetitive tasks consistent with unskilled work. See Tr. 43.

14

C.     Medical-Vocational Guidelines

Plaintiff alleges the ALJ erred in using the Grids and not obtaining VE testimony because she has both exertional and nonexertional limitations. In particular, she argues that VE testimony was necessary because Dr. Netherton found that Plaintiff would need a job which provided a sit/stand at-will option. The Commissioner contends that the ALJ properly relied on the Grids at step five to determine there were jobs that Plaintiff could perform.

When a claimant: (1) suffers from a nonexertional impairment that restricts his ability to perform work of which he is exertionally capable, or (2) suffers an exertional impairment which restricts him from performing the full range of activity covered by a work category, the ALJ may not rely on the Grids and must produce specific vocational evidence showing that the national economy offers employment opportunities to the claimant. See Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989); Hammond v. Heckler, 765 F.2d 424, 425-26 (4th Cir. 1985); Cook v. Chater, 901 F. Supp. 971 (D.Md. 1995). A nonexertional impairment is an impairment which is present whether the claimant is attempting to perform the physical requirements of the job or not. See Gory v. Schweiker, 712 F.2d 929 (4th Cir. 1983). Every nonexertional condition does not, however, rise to the level of a nonexertional impairment. The proper inquiry is whether there is substantial evidence to support the finding that the nonexertional condition affects an individual's residual capacity to perform work of which he is exertionally capable. Walker, 889 F.2d at 49; Smith v. Schweiker, 719 F.2d 723, 725 (4th Cir. 1984).

The ALJ did not err in using the Grids to meet the Commissioner's burden at step 5 of the sequential evaluation process as the ALJ found that Plaintiff had the RFC to perform light, unskilled work. Although the ALJ restricted Plaintiff to occasional climbing (ramps/stairs) and stooping and

never climbing ladders, such restrictions have little effect on the base of unskilled light work. See SSR 85-15. The ALJ acknowledged that Plaintiff had pain and found that it limited her to performing the simple, routine, repetitive tasks consistent with unskilled work. Tr. 43.

Plaintiff appears to argue that the ALJ should not have used the Grids based on the side effects of her medications. However, the ALJ found, contrary to Plaintiff's testimony, that her medical records did "not reveal that she consistently reported that her medications caused significant dizziness, drowsiness, or nausea." Tr. 43.

Plaintiff argues that the ALJ should have obtained testimony from a VE based on Dr. Netherton's opinion that she would need a sit/stand option. However, the ALJ discounted Dr. Netherton's opinion and determined that Plaintiff had an RFC to stand, walk, and sit for six hours each in an eight-hour day (see Tr. 40). Thus, the ALJ was not required to obtain testimony from a VE.

As the ALJ found that Plaintiff's alleged nonexertional impairments did not significantly limit her ability to perform unskilled light work, the ALJ reasonably relied on the Grids to determine that Plaintiff was not disabled. See, e.g., Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985)(a nonexertional limitation may cause the Grids to be inapplicable only where the limitation is severe enough to prevent a wide range of gainful employment at a particular level); Russell v. Sullivan, 950 F.2d 542, 545-546 (8th Cir. 1991)(where ALJ rejected claimant's subjective testimony that pain prevents him from engaging in the full range of sedentary work, the ALJ properly used the Grids to determine that the claimant was not disabled); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989)(when a claimant's subjective complaints of pain are explicitly discredited by the ALJ, the Commissioner's fifth step may be met by the use of the Grids); Pearce v. Colvin, No. 12-cv-01999,

2013 WL 2470305, at *9 (D.S.C. June 7, 2013)("If Plaintiff's nonexertional limitations have a minimal effect on his exertional occupational base, then a finding directed by the Grids is sufficient, and testimony by a VE is unnecessary.")(quoting Boland v. Astrue, No. 08-cv-00798, 2009 WL 2431536, at *7 (E.D.Va. Aug. 7, 2009)).

      D.      Appeals Council

Plaintiff alleges that reports in her file after her date last insured should be considered because they further show she is disabled. In particular, she argues that a report in August 2010 indicated she continued to have pain in her back and hips (Tr. 352); a report in January 2011 showed she still had pain in her back and hips, her pain was worse with sitting and increased activity, and her pain was better with medication and lying down (Tr. 403); and a report in July 2012 documented the same problems she had throughout her treatment at SESI. She argues that retrospective opinions should be considered if there is sufficient linkage between the prior medical condition and the subsequently offered opinions. Plaintiff alleges that the Appeals Council erred by not making detailed findings of the new medical reports which were submitted. She argues that these reports affirm her credibility and that the Appeals Council should have articulated reasons concerning the new evidence. In particular, Plaintiff argues that this evidence indicated she continued to have pain in her back as well as pain in her left knee of eight to ten out of ten; a May 2012 report documented her ongoing pain with lumbar disc disease and post-lumbar surgery, and the 2011 MRI showed a disc bulge at T10-11, a protrusion at L2-3, a disc bulge at L4-5, and possible annular foramen at L4-5 (Tr. 45). The Commissioner contends that the Appeals Council properly accounted for the evidence Plaintiff submitted after the ALJ's decision; the Appeals Council was not required to make detailed

findings concerning the new evidence submitted to the Appeals Council; and substantial evidence supports the ALJ's decision, even with the new evidence.

Plaintiff first appears to argue that the ALJ and/or Appeals Council should have considered evidence after her date last insured because these new reports show a continuing linkage of problems she had from the beginning of her treatment and a deterioration in her condition. In support of this, Plaintiff argues that "[t]he recent case in the Fourth Circuit of Bird v. Commissioner of Social Security, 699 F.3d [337], 340-342 (4th Cir. 2012), references the issue of retrospective opinions and indicated that such evidence was entirely proper if there is sufficient linkage between the prior medical condition and subsequently offered opinions." Plaintiff's Brief, ECF No. 19 at 9-10.The Commissioner contends that the ALJ properly considered evidence submitted to the ALJ which was from the period after Plaintiff's last date insured (December 31, 2009).

The ALJ properly considered the evidence submitted to him that was from the period after Plaintiff's date last insured. He considered the October 2010 report from Dr. Netherton, as discussed above. The ALJ considered other records of treatment after Plaintiff's date last insured as shown by his notations that a rhizotomy was performed in March 2010 (Tr. 42, 318); May 2010 electromyogram and nerve conduction studies were reportedly normal (Tr. 42, 345-346); pain management records through January 2011 generally noted negative straight leg raises (Tr. 42; see, 332); and clinical examinations through January 2011 normally indicated good strength and muscle tone (Tr. 42, see Tr.319, 360, 366). The Appeals Council also properly considered the new evidence submitted to it. This evidence consists of medical records from well after Plaintiff's date last insured which indicate that she continued to suffer from degenerative disk disease, but this evidence does not

18

contain a retrospective opinion and the records do not indicate a possible linkage to show that Plaintiff's condition was disabling prior to her date last insured.

Contrary to Plaintiff's argument that the Appeals Council erred in not making detailed findings concerning the evidence, the Fourth Circuit held in Meyer v. Astrue, 662 F.3d 700 (4th Cir. 2011) that "nothing in the Social Security Act or regulations promulgated pursuant to it requires that the Appeals Council explain its rationale for denying review." Id. at 705.

When the Appeals Council considers additional evidence offered for the first time on administrative appeal and denies review, courts must consider the record as a whole, including the new evidence, in determining whether the ALJ's decision is supported by substantial evidence. Meyer v. Astrue, 662 F.3d at 707; see Wilkins v. Secretary Dep't of Health and Human Servs., 953 F.2d 93, 96 (4th Cir.1991)(en banc). In Meyer, the Fourth Circuit held that it is not necessary for the Appeals Council to state reasons for its decision not to review the ALJ's decision. When the Appeals Council receives additional evidence and denies review, the issue for the reviewing court becomes whether the ALJ's decision is supported by substantial evidence or whether a remand is necessary for the ALJ to consider the new evidence. The claimant's treating physicians had a policy not to provide opinion evidence for Social Security proceedings. Therefore, the ALJ was not provided with any opinions by treating physicians. After the issuance of the ALJ's decision, the claimant was able to obtain an opinion letter from his treating physician, and the Appeals Council made the letter a part of the record but found that it did not provide a basis for changing the ALJ's decision. The Fourth Circuit remanded the case for further fact-finding because "no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record." Id. at 707.

Here, the Appeals Council considered the additional evidence, but reasonably found that it did not provide a basis for changing the ALJ's decision. See Tr. 2. The new evidence is merely cumulative. It consists of treatment notes indicating continuing reports of pain by Plaintiff and the prescribing of medications, including pain medications, for her condition. Plaintiff appears to admit that the evidence is cumulative, as she argues that the reports do not show any improvement; she continued to have back and hip pain; and the reports show that despite treatment, her condition is the same. See Plaintiff's Reply Brief, ECF No. 26 at 6. Additionally, the evidence submitted is from March 2011 to July 2012, more than a year after Plaintiff's date last insured. Here, the ALJ's decision is supported by substantial evidence even in light of the evidence submitted to the Appeals Council.

## **CONCLUSION**

Based on the foregoing, it is RECOMMENDED that the Commissioner's decision be **affirmed**.

Joseph R. McCrorey
United States Magistrate Judge

November 5, 2013
Columbia, South Carolina